IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LOCAL 705 INTERNATIONAL BROTHERHOOD OF TEAMSTERS PENSION FUND, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 18 CV 6893 |
| v. | ) ) | Judge Joan H. Lefkow |
| GRADEI'S EXPRESS CO., INC., GX WAREHOUSING, INC., ANTHONY PITELLO, and PAT PITELLO, | ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The Local 705 International Brotherhood of Teamsters Pension Fund has sued a former participating employer, Gradei's Express Co., Inc., seeking withdrawal contributions pursuant to the Employee Retirement Income Security Act ("ERISA") as amended by the Multiemployer Pension Plan Amendments of 1980 (the "MPPAA"). The fund also has sued three other defendants—GX Warehousing, Inc., Anthony Pitello, and Pat Pitello—alleging they are jointly and severally liable with Gradei's because they are trades or businesses under common control as defined by the MPPAA. The fund now moves for summary judgment. (Dkt. 33.) The Pitellos have filed a response and a cross-motion for summary judgment. (Dkts. 38, 41.) Gradei's and GX Warehousing did not file a response to the fund's motion. The fund's motion is granted. The Pitellos' motion is denied.[1]

---

[1] This court has subject matter jurisdiction under 29 U.S.C. § 1451(c). Venue is proper under 29 U.S.C. § 1451(d) because the fund is administered and defendants reside and do business in this district.

## BACKGROUND[2]

The fund provides its participants defined pension benefits that are paid for by employer contributions negotiated through collective bargaining agreements. (Dkt. 34, Pl. L.R. 56.1 Stmt., ¶ 4.) When a contributing employer ceases to have a prospective obligation to pay contributions to the fund—by going out of business, for example—the fund's governing plan of benefits provides for the collection of "withdrawal liability" as permitted by ERISA. (*Id.* ¶ 5). Under Local 705's plan, if an employer defaults on withdrawal liability payments, the fund is entitled to recover (1) interest at the rate of 8% per year on the unpaid balance from the date of the first missed payment, (2) liquidated damages in the greater amount of the interest on the unpaid liability or 20% of the unpaid liability, and (3) court costs and attorneys' fees.[3] (*Id.* ¶ 6; dkt. 34-1 at 20-21[4]).

At all relevant times until approximately February 23, 2018, Gradei's, a trucking company, was party to a CBA with Local 705 that obligated it to pay contributions to the fund. (*Id.* ¶ 12). Gradei's ceased all operations covered by the CBA on or about February 23, 2018,

---

[2] Unless otherwise noted, the facts set out below are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to the non-moving party. The court will address many but not all the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Following its regular practice, the court has considered the parties' objections to the statements of facts and includes in its opinion only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted.

[3] The parties do not explain how the terms of the plan of benefits are binding on employers like Gradei's, but they nevertheless agree that they are. (Dkt. 34 ¶ 6; dkt. dkt. 42 at 1); *see generally* 29 U.S.C. § 1145 ("Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement"). Presumably this obligation arises by virtue of Gradei's CBA.

[4] All page citations to documents in the record refer to the numbering imposed by the CM/ECF system rather than any different numbering used by the parties.

and filed a Chapter 7 bankruptcy petition on June 8, 2018. (*Id.* ¶¶ 13, 23.) The bankruptcy case closed on July 19, 2018. (*Id.*)

Anthony and Pat Pitello are each 50% shareholders of both Gradei's and GX Warehousing, a provider of storage and warehousing services. (*Id.* ¶¶ 8, 9.) At all relevant times, the principal office of both Gradei's and GX Warehousing was located at 2035 N. 15th Avenue, Melrose Park, Illinois ("the Property"). (*Id.* ¶¶ 7-8). The Property is owned in equal shares by Anthony and Pat Pitello and their father, Pat M. Pitello. (*Id.* ¶ 11.)

The Pitellos allowed Gradei's to use the Property rent-free for at least four or five years prior to its bankruptcy. (*Id.* ¶ 14; dkt. 34-1 at 54). Gradei's never paid any money toward a mortgage loan, property taxes, property insurance, or utility bills with respect to the Property. (Dkt. 37, D. L.R. 56.1 Stmt., ¶ 14.) Similarly, no Gradei's employee performed maintenance on the Property. (*Id.* ¶ 17.) Anthony and Pat Pitello never received any tax benefits related to Gradei's use of the Property. (*Id.* ¶ 15.)

In 2018 and 2019, GX Warehousing leased space at the Property to a third-party company, KForce, at a rate of $2,800.00 per month. (*Id.* ¶ 11.) On January 24, 2019, GX Warehousing leased space at the Property to another third-party company, Essential Parts, Inc., at the rate of $19,000.00 per year. (*Id.* ¶ 12.) GX Warehousing apparently signed the leases on the Property and collects the rents thereon, but the parties agree that it has no ownership interest in the Property. (Dkt. 34-1 at 55-56; dkt. 34, Pl. L.R. 56.1 Stmt., ¶ 10.)

On March 2, 2018, the fund sent Gradei's a notice and demand for payment of an assessed withdrawal liability in the amount of $221,932.55. (Dkt. 34, Pl. LR 56.1 Stmt., ¶ 16). The notice advised Gradei's that it could request review of the assessed withdrawal liability in writing within 90 days. (*Id.* ¶ 17). Gradei's did not request review or initiate arbitration to contest

the assessment as permitted by ERISA.[5] (*Id.* ¶¶ 19-22). Gradei's has never made any payments on the assessed withdrawal liability.[6] (*Id.* ¶ 25).

The fund has sued to collect the assessed withdrawal liability and the penalties and fees for default as provided in the plan of benefits.

### LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In

---

[5] ERISA specifies the process by which a pension plan must notify a withdrawing employer of an assessed withdrawal liability, and the withdrawing employer's options in response to such notice. *Cent. States, Se. & Sw. Areas Pension Fund* v. *Bomar Nat., Inc.*, 253 F.3d 1011, 1014 (7th Cir. 2001); 29 U.S.C. § 1399. In order to collect withdrawal liability, a pension plan must determine the amount owed and send the employer a notice and demand for payment. *Id.* An employer that disputes the amount may demand arbitration. 29 U.S.C. § 1401(a); *Cent. States, Se. & Sw. Areas Pension Fund* v. *Bell Transit Co.*, 22 F.3d 706, 707 (7th Cir. 1994). Failure to demand arbitration renders "the amounts demanded by the plan sponsor . . . due and owing on the schedule set forth by the plan sponsor." 29 U.S.C. § 1401(b); *Bell Transit*, 22 F.3d at 707; *Chi. Truck Drivers, Helpers & Warehouse Union Pension Fund* v. *Century Motor Freight, Inc.*, 125 F.3d 526, 533-34 (7th Cir. 1997). Where an employer subsequently fails to make the payments demanded, and such failure is not cured within 60 days of the plan sponsor providing notice, the failure is deemed a default and the plan sponsor may demand immediate payment. 29 U.S.C. §§ 1399(c)(5) and 1401(b)(1); 29 C.F.R. § 4219.31(c)(1); *Cent. States Se. & Sw. Areas Pension Fund* v. *O'Neill Bros. Transfer & Storage Co.*, 620 F.3d 766, 774 (7th Cir. 2010). Defendants do not dispute that the fund appropriately provided notice of its assessed withdrawal liability. Conversely, the fund does not argue that defendants' failure to request arbitration within the allotted time period results in a forfeiture of their right to challenge their assessed withdrawal liability here. *See Trustees of Suburban Teamsters of N. Illinois Pension Fund* v. *E Co.*, 914 F.3d 1037, 1039 (7th Cir.), *cert. denied,* 140 S. Ct. 439 (2019).

[6] As mentioned above, Gradei's has not filed a response to the present motion, and thus there is no contention before the court that its bankruptcy filing affected its obligations to the fund in any way. *See generally Cent. States, Se. & Sw. Pension Fund* v. *Slotky,* 956 F.2d 1369, 1375 (7th Cir. 1992).

doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007). When considering cross-motions for summary judgment, the court must be careful to draw reasonable inferences in the correct direction. *See, e.g.*, *Int'l Bhd. of Elec. Workers, Local 176* v. *Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare*, 629 F.3d at 704.

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## ANALYSIS

**I.     Multiemployer Pension Plan Withdrawal Liability**

ERISA was enacted in 1974 to protect employee pension plans from underfunding. *See Cent. States, Se. & Sw. Areas Pension Fund* v. *Midwest Motor Exp., Inc.*, 181 F.3d 799, 803 (7th Cir. 1999); *Concrete Pipe & Products of Cal., Inc.* v. *Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 607, 113 S. Ct. 2264 (1993). As amended by the MPPAA, it does so in part by requiring employers who withdraw from a multiemployer pension plan to contribute to a proportionate share of the plan's unfunded vested benefits. *Midwest Motor*, 181 F.3d at 803; 29 U.S.C. §§ 1381(b), 1391. The statute defines this obligation as an employer's "withdrawal liability." 29 U.S.C. § 1381.

Withdrawal liability applies not only to the withdrawing employer itself, but also to all other "trades or businesses" that are under the same umbrella of "common control." 29 U.S.C. § 1301(b)(1); *Cent. States, Se. & Sw. Areas Pension Fund* v. *SCOFBP, LLC*, 668 F.3d 873, 876 (7th Cir. 2011). The purpose of this rule is "to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities . . ." *Cent. States Se. & Sw. Areas Pension Fund* v. *Messina Prod., LLC*, 706 F.3d 874, 878 (7th Cir. 2013); *see also SCOFBP,* 668 F.3d at 878. The Seventh Circuit has held that such common-control liability applies regardless of whether the controlled trades or businesses are "economically related" to the withdrawing employer. *Cent. States, Se. & Sw. Pension Fund* v. *Personnel, Inc.*, 974 F.2d 789, 793 (7th Cir. 1992); *Slotky,* 956 F.2d at 1374.

Withdrawal liability was not intended, however, to reach the personal assets of owners or shareholders of a withdrawing employer, absent a showing that they acquired the assets of the withdrawing employer to evade withdrawal liability. *See Cent. States, Se. & Sw. Areas Pension Fund* v. *Fulkerson*, 238 F.3d 891, 896 (7th Cir. 2001); *SCOFBP*, 668 F.3d at 878; 29 U.S.C. § 1392(c). As distinct from trades and businesses, investments of a personal nature are "things like holding shares of stock or bonds in publicly traded corporations," as well as owning property in certain circumstances, such as "where the owner spends a negligible amount of time managing the leases." *SCOFBP*, 668 F.3d at 878.

### A. Whether The Pitellos' Leasing Activity Should Be Deemed A Business Under Common Control

The fund contends that the Pitellos should be deemed to be engaged in a trade or business that shares common control with Gradei's because they leased Gradei's the real estate it used as its principal office. (Dkt. 35 at 7.) The Pitellos do not contest that the common control element is

met, but dispute that their lease of the property to Gradei's—which was rent-free—constitutes a trade or business. (*See* dkt. 38 at 1.)

In determining whether an entity is a trade or business, the Seventh Circuit has adopted the test established by the Supreme Court for tax purposes in *Commissioner of Internal Revenue* v. *Groetzinger,* 480 U.S. 23, 35, 107 S. Ct. 980 (1987). *See Messina*, 706 F.3d at 878. The test asks whether the entity's activities "are performed (1) for the primary purpose of income or profit; and (2) with continuity and regularity." *Id*. These criteria are intended to distinguish a trade or business from passive investments or hobbies. *See SCOFBP*, 668 F.3d at 873.

The Seventh Circuit also has repeatedly held that "renting property to a withdrawing employer is categorically a trade or business." *Messina*, 706 F.3d at 883 (internal punctuation omitted); *see also SCOFBP*, 668 F.3d at 879; *Cent. States, Se. & Sw. Areas Pension Fund* v. *Nagy*, 714 F.3d 545, 550 (7th Cir. 2013) (characterizing this as a "bright-line rule"). The reason for this rule is that "where the real estate is rented to or used by the withdrawing employer and there is common ownership, it is improbable that the rental activity could be deemed a truly passive investment. In such situations, the likelihood that a true purpose and effect of the 'lease' is to split up the withdrawing employer's assets is self-evident." *Messina*, 706 F.3d at 882.

The Pitellos' brief discusses the Seventh Circuit's opinions in *Messina* and *SCOFBP*, but characterizes the categorical rule as applying only to situations where "individual defendants receive lease payments from the withdrawing employer." (Dkt. 38 at 6.) The Pitellos acknowledge that the withdrawing employer in *Messina* had a rent-free lease for the two years before it went bankrupt, but argue that *Messina* is nevertheless distinguishable because the withdrawing employer previously had paid rent for approximately forty years. (*Id.* at 6-7.) The Pitellos also argue that *Messina* is distinguishable in that the leasing arrangement there increased

7

the value of the property because the lessee paid the property insurance and utilities and performed maintenance, and the lessor claimed tax benefits based on the lease—factors which are not present here. (*Id.* at 8.)

The Pitellos cite no case, however, holding that an exception to the categorical rule exists.[7] To the contrary, this court has at least twice applied the categorical rule to rent-free leases in recent years. *Cent. States, Se. & Sw. Areas Pension Fund* v. *PHBC, LLC*, No. 16-CV-8439, 2018 WL 4898878, at *2, 6 (N.D. Ill. Oct. 9, 2018); *Trs. of Suburban Teamsters of N. Ill. Pension Fund* v. *E Co.*, No. 15 C 10323, 2018 WL 1427172, at *6 (N.D. Ill. Mar. 22, 2018), *aff'd,* 914 F.3d 1037 (7th Cir. 2019), *cert. denied,* 140 S. Ct. 439 (2019)

The court is unpersuaded that there is reason to depart from the categorical rule in this case. The fact that the Property was leased to Gradei's rent-free makes real the prospect that the Pitellos elected to hold the Property in their own names rather than through Gradei's to shield it from liabilities Gradei's might incur. That is precisely the type of "fractionalizing" the statute was designed to prevent. *Slotky*, 956 F.2d at 1374 ("the use of a controlled nominee to screen assets from creditors is just the sort of device at which the controlled group provision is aimed"); *Messina*, 706 F.3d at 882 ("the likelihood that a true purpose and effect of the 'lease' is to split up the withdrawing employer's assets is self-evident"). The Pitellos have presented no evidence sufficient to create a genuine issue as to whether the arrangement had a different purpose indicative of a personal investment.[8] *See SCOFBP*, 668 F.3d at 879 (affirming grant of summary

---

[7] The Pitellos rely principally on *Central States* v. *White,* 258 F.3d 636 (7th Cir. 2001) and *Fulkerson*, 238 F.3d 891. (Dkt. 38 at 5-6.) The Seventh Circuit has described those cases as "easily distinguishable" from situations where a party "rented property to the withdrawing employer itself." *Messina*, 706 F.3d at 882; *see also SCOFBP*, 668 F.3d at 879 (describing *White* and *Fulkerson* as "unusual situations that tested the outer bounds of the 'personal investment' concept").

[8] The Pitellos argue that the rent-free lease placed Gradei's in an "arguably better position to pay its withdrawal liability obligations." (Dkt. 38 at 7.) That is true as compared to a scenario in which

judgment against lessor of property to withdrawing employer); *Nagy*, 714 F.3d at 553 (same); *PHBC*, 2018 WL 4898878, at *6 (same).

Furthermore, even a rent-free lease to a controlled entity provides some value to the lessor by allowing the property to be occupied in a manner that is known and controlled. *See Pension Benefit Guar. Corp.* v. *Findlay Indus., Inc.*, 902 F.3d 597, 607 (6th Cir. 2018) (lessor "did not have to put in any of the effort or face any of the risk of an arms-length leasing arrangement with a lessee that was not under common control"); *SCOFBP*, 668 F.3d at 878 ("even activity that does not produce a net gain. . . can be 'for the primary purpose of income or profit' where that activity increases equity. . ."). Thus, the court concludes that the Pitellos were engaged in a trade or business subject to common control for purposes of withdrawal liability and thus are jointly and severally liable along with Gradei's.

B. **Gradei's and GX Warehousing's Liability**

Neither Gradei's nor GX Warehousing responded to the fund's motion for summary judgment and thus it will be granted against them.

---

Gradei's paid rent to the Pitellos or a third party. But that does not address the fractionalization concern, which is why the Pitellos elected not to have Gradei's purchase and manage the property itself. It also misunderstands the operation of the MPPAA, which can reach a wide range of assets that have no relationship to the withdrawing employer so long as they are part of a trade or business under common control. *See Nagy*, 714 F.3d at 552 (affirming summary judgment holding individual personally liable for withdrawal liability based on his independent contractor work in a separate industry).

The court observes that there is arguably some arbitrariness in holding individuals who control withdrawing employers personally liable for withdrawal obligations if they engage in separate unincorporated business activity, as here, but generally not reach their personal assets otherwise. But the Seventh Circuit has explained that, like many statutes, the MPPAA represents "a compromise embodying competing purposes and is intended to effectuate certain policies only to a restricted degree." *Fulkerson*, 238 F.3d at 896–97.

**II.     Damages**

The fund requests damages in the form of (1) assessed withdrawal liability of $221,932.55; (2) interest on the assessed withdrawal liability calculated at 8% per year from May 2, 2018 forward[9]; (3) liquidated damages calculated at 20% of the balance due on the assessed withdrawal liability of $44,386.51; and (4) costs and attorneys' fees. (Dkt. 20 at 5.)

The Pitellos do not specifically contest the fund's damages request. The parties thus should confer and present appropriate figures for interest and costs and fees.

## CONCLUSION AND ORDER

The fund's motion for summary judgment (dkt. 33) is granted with respect to all defendants. The Pitellos' motion for summary judgment (dkt. 36) is denied. The parties should confer and attempt to reach agreement on the interest and costs and fees to be awarded to the fund pursuant to this order. If agreement can be reached, the fund should submit a proposed judgment order by April 14, 2020. If no agreement can be reached, the parties should submit and support their respective positions by the same date.

Date: March 31, 2020

_____
U.S. District Judge Joan H. Lefkow

---

[9] May 2, 2018 is the date on which the fund requested Gradei's first payment be made. (Dkt. 34 ¶ 16.) Interest thus accrues from that date. 29 U.S.C. § 1399(c)(5); *O'Neill Bros.*, 620 F.3d at 771.